# In The United States Court of Federal Claims

No. 99-721C

(Filed: September 28, 2004)

| | | |
|---|---|---|
| THE AMERICAN INSURANCE COMPANY, | * | |
| | * | Summary judgment; Miller Act surety; No |
| Plaintiff, | * | contractual relationship between surety and |
| | * | government; No right to equitable |
| v. | * | subrogation; *National Surety* distinguished; |
| | * | Contract did not mandate retainages; No |
| THE UNITED STATES, | * | abuse of discretion in making progress |
| | * | payments to contractor; General reliance on |
| Defendant. | * | fiduciary or equitable duties rejected. |
| | * | |

**OPINION**

*Paul T. DeVlieger,* Blackburn & Associates, Philadelphia, PA, for plaintiff.

*Jonathan Reid Prouty,* U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge:**

The plaintiff in this case, American Insurance Company (American), served as the Miller Act surety on an Air Force construction contract. It seeks compensation from the United States alleging that the Air Force improperly released progress payments to the construction contractor, thereby impairing plaintiff's suretyship and increasing its costs when it was required to take over performance of the contract. Defendant has filed a motion for summary judgment, asserting that, in dispensing the funds in question, it breached no legally cognizable duty to plaintiff. Based on its review of the record and the parties' assertions, and for the reasons that follow, the court finds the latter argument persuasive and **GRANTS** defendant summary judgment.

## I. BACKGROUND

The relevant facts are relatively uncomplicated:

This case finds it origins in a February 14, 1994, Air Force contract with G&C Enterprises, Inc. (G&C) to construct an aircraft parking apron and a jet fuel storage facility at McGuire Air Force Base, New Jersey, for the firm fixed-price of $10,380,390. The contract had

a completion date of June 15, 1996. It included the following standard FAR provision regarding progress payments:

> The Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer, on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer. The Contractor shall furnish a breakdown of the total contract price showing the amount included therein for each principal category of the work, which shall substantiate the payment amount requested in order to provide a basis for determining progress payments, in such detail as requested by the Contracting Officer.

It further provided that –

> If the Contracting Officer finds that satisfactory performance was achieved during any period for which a progress payment is to be made, the Contracting Officer shall authorize payment to be made in full. However, if satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved.

Pursuant to the Miller Act, 40 U.S.C. §§ 270a-270d (1994), plaintiff issued payment and performance bonds on behalf of G&C in connection with this contract.

During performance of the contract, G&C periodically submitted requests for progress payments to the contracting officer together with progress reports reflecting the work it had completed. The contracting officer reviewed these documents and issued payments pursuant to the contract provisions quoted above.

Around June of 1996, G&C began experiencing difficulties in completing the contract. The parties have slightly different accounts of what happened next. American alleges that it learned that G&C was in a state of financial difficulty and that, when contacted, the Air Force confirmed that G&C was making unsatisfactory progress and technically in default. Defendant alleges that, on June 22, 1996, a windstorm damaged facilities being constructed by G&C on a separate unrelated contract with the government. It contends that, for approximately six months, G&C failed to complete work on this unrelated contract, as well as the contract for which American served as surety. Defendant avers that it informed G&C that it was considering terminating the contracts for default. Finally, it asseverates that American and the Air Force entered into negotiations, wherein American assured the Air Force that it would provide G&C with the necessary financial resources to complete the project and the Air Force, in turn, assured American that it would not terminate its contract with G&C for default.[1]

---

[1] American asserts that, in these discussions, representatives of the Air Force acknowledged that they had "overpaid" G&C, that is, provided G&C with payments that exceeded its progress; however, defendant contests this.

Sometime after June of 1996 – and the record does not disclose exactly when – American assumed *de facto* managerial control over the project in order to protect its financial interest. It entered into a subcontractor/takeover agreement with G&C and contracted with C&T Associates, Inc. (C&T) to complete the project for $2.7 million. G&C remained the contractor under the contract, but in name only, with American maintaining custody and control of the remaining contract funds, which were paid over to C&T. By letter dated May 23, 1997, American informed the Air Force of this arrangement.[2] But, American did not enter into a formal takeover agreement with the Air Force; instead, it was agreed upon and understood by both parties that payments under the contract would continue to be made to G&C. By the time this letter was received, the Air Force had already paid G&C about 97 percent (all but $307,118) of the contract price; however, the plaintiff alleges – and defendant does not contest – that only 80 percent of the contract performance had been completed at that time.

On August 20, 1999, plaintiff filed an action in this court asserting that defendant had overpaid G&C by $842,000, representing the difference between the 97 percent of the contract price paid to G&C and the 80 percent it alleges should have paid for the amount of work G&C had actually completed by the time American assumed performance under the contract. On June 7, 2004, oral argument was heard on the defendant's motion for summary judgment.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative under the governing law – and there a several like that here – will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho. Inc. v.*

---

[2] For reasons that are unexplained, the letter is not in the record. However, in his affidavit, John W. Simms, the contracting officer here, describes the letter as follows:

> By letter dated May 23, 1997, American Insurance wrote to me notifying me that G&C Enterprises Inc. was experiencing financial problems. American Insurance Company further notified me that they were soliciting bids from completion contractors to finish the project. It was agreed upon and understood by both parties that progress payments would be made to G&C Enterprises, Inc. and then in turn payments would be made to the completion contractor, with the approval of Cashin Associates, the project manager. American Insurance Company never requested stoppage of progress payments to G&C and never notified the Contracting Officer that defaulting [sic] G&C Enterprises Inc.

Plaintiff does not contest this characterization of the letter.

*United States*, 47 Fed. Cl. 595, 599 (2000). When reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *see also Agosto* v. INS, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)).

A surety arrangement typically involves three parties: an obligee who has recourse against a surety (the secondary obligor) with respect to the obligation of another person (the principal obligor) to that obligee. *See* Restatement (Third) of Suretyship and Guaranty (hereinafter "Restatement") § 1(1)(a) (1996). The central issue raised in this case is whether defendant – the obligee – owes plaintiff – the secondary obligor – the difference between the amount of money that it paid G&C – the principal obligor – and the value of the work G&C actually completed.

In its complaint, plaintiff raised four theories in support of this recovery, *to wit*, that: (i) defendant breached a "three-party contract of suretyship" through its alleged failure to administer properly the contract with G&C; (ii) American should be equitably subrogated to defendant in the amount of the completion costs; (iii) defendant breached its "fiduciary duty" to American by failing to protect the contract balance on behalf of American; and (iv) defendant breached "equitable duties" to American through its failure to protect the contract balance. However, in its brief in response to defendant's motion, plaintiff did not discuss, in any detail, the first, third and fourth of these theories, giving rise to a reasonable argument that it had waived these theories. *See Jay v. Sec'y of Dept. of H.H.S.*, 998 F.2d 979, 983, n. 4 (Fed. Cir. 1993); *Sheets v. United States*, 2 Cl. Ct. 101, 102, n. 2 (1983). But, at oral argument, plaintiff's counsel appeared to weave all four theories into various permutations of his equitable subrogation argument. Based on this, the court believes that it is best to address each of the four theories originally raised by plaintiff, which it will do *seriatim*.

First, the Federal Circuit has squarely rejected the notion that, in the absence of a takeover agreement, a suretyship arrangement creates a direct contractual relationship between the defendant/obligee and the surety. Here, there was neither such a takeover agreement nor any indication that American was viewed as a third-party beneficiary of the contract between defendant and G&C. The situation is essentially identical to that in *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499 (Fed. Cir. 1990), where the Federal Circuit found that "the documents and facts of record here neither expressly nor implicitly establish the existence of an independent contract," and that there was no other evidence that "the government undertook any obligation" to the surety. In such circumstances, it is beyond cull that the government does not owe the surety a contractual duty not to release funds to a contractor. *See, e.g., United Pacific Ins. Co. v. Roche*, 2004 WL 1837592 at *2 (Fed. Cir. 2004); *Ins. Co. of the West v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001); *Ransom v. United States*, 900 F.2d 242, 244-45 (Fed. Cir.

1990); *Admiralty Constr. Inc. v. Dalton*, 156 F.3d 1217, 1220-21 (Fed. Cir. 1998); *see also Preferred Nat. Ins. Co. v. United States*, 54 Fed. Cl. 600, 604 (2002). Accordingly, plaintiff cannot recover under its contract theory.[3]

With regards to plaintiff's equitable subrogation theory, it is axiomatic that "before any obligation arises to withhold or divert funds, the Government must be notified that the sureties believe the contractor is in default and cannot complete the contract." *Ransom v. United States*, 17 Cl. Ct. 263, 272 (1989), *aff'd*, 900 F.2d 242 (Fed. Cir. 1990). Thus, notice that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds converts the government into a stakeholder with duties to the surety; the latter, by virtue of being subrogated to the rights of its principal, is then able to sue under the Tucker Act. *Id*; *Ransom*, 900 F.2d at 245; *Ins. Co. of West v. United States*, 55 Fed. Cl. 529, 539 (2003); *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308, 314 (1994).[4] Absent such notice, those duties, and the concomitant ability to invoke this court's jurisdiction, generally do not attach. *See Ins. Co. of West*, 243 F.3d at 1371. Because the surety may decide that its interest are best served by continuing to have payments sent directly to the principal contractor, constructive notice that a contractor has defaulted and the surety has taken over the performance of the contract is insufficient, standing alone, to trigger this form of subrogation.[5]

---

[3] To be sure, in *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985), the Federal Circuit stated, albeit in *dicta*, that "[a] suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the party obligee." The Court of Claims made similar statements in a case decided at the turn of the last century. *See Shwarz v. United States*, 35 Ct. Cl. 303 (1900). Numerous subsequent decisions by the Federal Circuit, however, have clarified that while, under the typical arrangement, the surety owes certain obligations to the government and *vice-versa*, those obligations are not directly contractual in nature, but arise either because the government is a third-party beneficiary of the guaranty between the surety and the primary obligor, or when the surety steps into the shoes either of the contractor or the government under some permutation of the doctrine of equitable subrogation. *See Admiralty Constr.*, 156 F.3d at 1221-22 (explaining *Balboa* on this basis); *Ransom*, 900 F.2d at 245 (same); *Preferred Nat. Ins.*, 54 Fed. Cl. at 603 (same).

[4] Further explaining the role played by this notice requirement, the Federal Circuit, in *Fireman's Fund*, stated –

> [o]nly when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; consequently, only notice by the surety triggers the government's equitable duty.

909 F.2d at 499.

[5] *See, e.g., Newark Ins. Co. v. United States*, 169 F. Supp. 955, 957 (Ct. Cl. 1975) (for the stakeholder duty to arise, the government must have "due notice of the facts giving rise to an

Under the undisputed facts of this case, American's right to equitable subrogation never attached because it not only failed to notify the Air Force to stop making payments to the contractor, but instead asked the Air Force to continue making such payments. Indeed, even if plaintiff were viewed as having provided the requisite notice in its May 23, 1997, letter or sometime shortly before, it appears undisputed that, by that time, the supposed "overpayments" of which plaintiff complains had already occurred. Accordingly, this theory also avails plaintiff naught.

Plaintiff correctly notes that a surety may, without providing the requisite notice, recover against an obligee that impairs its suretyship status. Thus, in *National Surety v. United States*, 118 F.3d 1542 (Fed. Cir. 1997), the government failed to retain the required ten percent from progress payments as its contract with the defaulted contractor required; instead, it made full payment to the contractor, which ultimately abandoned the project and was terminated for default. *Id.* at 1543-44. National Surety sought to recover from the government the funds that should have been retained from the progress payments. *Id*. at 1545. The Federal Circuit found that the government was liable for the improper release of the retainages, even though it had not received formal notice of the default. *Id*. at 1544-46. This liability sprang, the court indicated, from the government's obligations to the surety, to which the government owed the duty "to

---

equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right"). This court was faced with a similar situation in *Westchester Fire Ins. Co. v. United States*, 52 Fed. Cl. 567 (2002). There, as here, the surety did not notify the government agency involved, the Coast Guard, to withhold progress payments from the contractor. The surety argued that the Coast Guard was aware that the contractor's performance was deficient at the time that it issued a final progress payment. The court held that this was not enough to meet the notice requirement, stating –

> The progress payment issue falls squarely under the controlling case law. Because [the surety] did not give notice to the Coast Guard of [the contractor's] default on the surety bonds, and did not request that the last progress payments be withheld, it failed to 'trigger the government's equitable duty to act with reasoned discretion toward it.' *Fireman's Fund*, *supra*, 909 F.2d at 499. It is not the Government's responsibility, as the Federal Circuit made clear in *Fireman's Fund*, to divine the surety's thinking process, or to act as a nanny for the surety and ask it whether, under the circumstances of a given contract, it would like the Government to withhold progress payments to the contractor. [The surety] was fully apprised of [the contractor's] performance record and the danger of its default on the . . . contract . . . because it was copied on the Coast Guard's warning notices to [the contractor]. It was [the surety's] responsibility to decide for itself what it wanted to do, if anything, with the information it received from the Coast Guard. It chose to do nothing, and it was not the Coast Guard's prerogative or duty to substitute its judgment for the surety's.

*Id*. at 579.

administer the contract, during the course of its performance, in a way that [did] not materially increase the risk that was assumed by the surety when the contract was bonded." *Id*. at 1546 (quoting *U.S. Fidelity & Guar. Co. v. United States*, 475 F.2d 1377, 1384 (Ct. Cl. 1973)).

By way of further explanation, the Federal Circuit observed that "[i]t is of course almost axiomatic that any change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation" *Id*. at 1547. Recognizing that such a discharge was of little direct value to the surety because it already had performed before the breach, the court, nonetheless, concluded that the surety was entitled to an affirmative recovery against the government, reasoning –

> Contract terms that provide security for the bonded performance can not be ignored, waived, or modified without consideration of the surety's interests. . . . The government's failure to retain the required sums during performance of the . . . contract was a change in the terms from those on which the surety provided its bonds. When National Surety completed the contract in accordance with its performance bond, it was entitled to the benefit of the contractually-required retainage. The government's improper release of this security does not avoid liability to the surety for losses thereby sustained.

*Id.* at 1547. In so holding, the Federal Circuit cited, with approval, section 37 of the Restatement,[6] under which a surety has a claim against an obligee that increases its costs of

---

[6] Section 37(1) of the Restatement provides that "[i]f the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, . . . the secondary obligor has a claim against the obligee as described in subsection (4)." Subsection (4) states –

> (4) If the obligee impairs the secondary obligor's suretyship status
>
> (a) after the secondary obligor performs any portion of the secondary obligation; or
>
> (b) before the secondary obligor performs a portion of the secondary obligation, if the secondary obligor then performs:
>
> (i) without knowledge of such impairment;
> (ii) for the benefit of an intended beneficiary who can enforce the secondary obligation notwithstanding such impairment; or
> (iii) under business compulsion;
>
> the secondary obligor has a claim against the obligee with respect to such performance to the extent that such impairment would have discharged the secondary obligor with respect to that performance.

performance even if the latter is unaware that the obligor has defaulted. *Id.*; *see also Westchester Fire Ins. Co.*, 52 Fed. Cl. at 577. However, the Federal Circuit stressed that, to recover under this theory, it must be shown that the government actually departed from the terms of its contract with the primary obligor. *Nat'l Surety Corp.*, 118 F.3d at 1546. It held that the rule applied to the case before it because the contract did not give the government "discretion" to depart from the retainage requirements on the facts presented. *Id.* at 1547.

In the case *sub judice*, there is no indication that the Air Force violated the terms of its contract with C&G. As to progress payments, that contract provided that "[t]he Government shall make progress payments monthly as the work proceeds, or at more frequent intervals as determined by the Contracting Officer." Contrary to plaintiff's importunings, this provision does not prohibit the contracting officer from making payments beyond those dictated by the progress of work – it merely affirmatively required such payments as progress was made. Any notion that this provision could be applied in the converse to govern unsatisfactory performance ignores the fact that the contract had a specific provision which provided that in the absence of satisfactory progress, "the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." The use of the permissive terms "may" and "maximum" plainly allowed, but did not require, the contracting officer to retain up to 10 percent of the payment for a given period.[7] In other words, this language authorized the contracting officer to make payments in full despite the contractor's lack of progress. The language here thus stands in stark contrast to the mandatory terms – "shall have 10 percent retainage withheld" – employed in the contract in *National Surety*. *Id*. at 1543. It was, of course, this mandatory language that led the Federal Circuit to conclude that the government had breached its obligations to the surety by failing to retain the funds. *Id*. at 1543-47. Here, that mandate is conspicuously lacking.

Of course, various cases suggest that if the Air Force abused its discretion in making progress payments that too could be viewed as an impairment of plaintiff's suretyship and give rise to damages. "During the performance of the contract," the Court of Claims once stated, "the Government has a duty to exercise its discretion responsibly and to consider the surety's interest

---

Restatement, § 37(4); *see also id.* at cmt d ("Subsection (4) gives the secondary obligor a claim against the obligee to the extent that the impairment of suretyship status would have discharged the secondary obligor.").

[7] While the word "may" can, in some contexts, mean "must", *see Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 198 (2000), it ordinarily connotes discretionary authority. *See McBryde v. United States*, 299 F.3d 1357, 1362 (Fed. Cir. 2002) ("[t]he word 'may,' when used in a statute usually implies some degree of discretion"). Here, the latter meaning is confirmed by the presence of another term signaling discretion – "maximum." That word has been construed to afford discretion to set an amount below the specified level, to and including zero. *See Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 375 (2004) (citing cases); *see also Public Service Comm'n of Md. v. City of Annapolis*, 71 Md.App. 593, 526 A.2d 975, 981 (1987) ("the statement of a maximum does not imply the existence of a minimum").

in conjunction with other problems encountered in the administration of the contract." *Argonaut Ins. Co. v. United States*, 434 F.2d 1362, 1368 (Ct. Cl. 1970); *see also Nat'l Surety*, 118 F.3d at 1546; *U.S. Fidelity & Guaranty Co.*, 475 F.2d at 1384. But, this is not to say that the United States must, in all circumstances, exalt the surety's interests over its own. To the contrary, courts have recognized that, during the performance of a contract, the government "has an important interest in the timely and efficient completion of the contract work," *Argonaut Ins.*, 434 F.2d at 1367, and is "far from being a simple stakeholder," *U.S. Fidelity & Guaranty Co.*, 475 F.2d at 1384; *see also U.S. Fidelity and Guaranty Co. v. United States*, 676 F.2d 622, 630 (Ct. Cl. 1982). "[W]here the government representative is notified of the contractor's nonpayment of obligations during the performance of the contract, the representative is faced with the task of balancing the Government's interest in proceeding with the contract, against possible harm to the surety." *U.S. Fidelity & Guaranty Co.*, 475 F.2d at 1384; *see also United Bonding Ins. Co. v. Catalytic Constr. Co.*, 533 F.2d 469, 475 (9th Cir. 1976). Numerous cases have recognized, generally, that contracting officer's discretion in performing this weighing of interests and in deciding whether to withhold a progress payment is necessarily "broad," and, more specifically, that, unless restricted by the contract, the government may make progress payments to the contractor beyond what is warranted by the contractor's actual performance where, for example, the contractor is experiencing cash flow problems. *See Nat'l Surety*, 118 F.3d at 1546; *Fireman's Fund*, 909 F.2d at 498 (noting that the government has "considerable leeway" in this regard"); *Argonaut Ins. Co.*, 434 F.2d at 1367-68; *United Pac. Ins. Co. v. United States*, 16 Cl. Ct. 555, 557 (1989).

The key question then becomes whether the Air Force's contracting officer did, in fact, responsibly exercise the discretion given him. On this count, plaintiff has failed to establish any genuine issue of material fact as to whether the contracting officer abused his discretion in continuing to make, under the circumstances presented, full progress payments. Rather, apart from general allegations made by its counsel during oral argument, plaintiff never addressed this issue and instead chose to argue that those payments were not authorized by the contract – a proposition that this court has now rejected. *See Pure Gold, Inc. v. Syntex*, 739 F.2d 624, 626-27 (Fed. Cir. 1984) ("In countering a motion for summary judgment, more is required than mere assertions of counsel. The non-movant may not rest on its conclusory pleadings, but, under Rule 56, must set out, usually in an affidavit . . . what specific evidence could be offered at trial."); *Ferguson Propeller, Inc. v. United States*, 59 Fed. Cl. 51, 58 (2003).[8] Indeed, while the record on this point is sketchy, it appears that the contracting officer made the payments in question

[8] In various of its affidavits, plaintiff asserts that Air Force representatives admitted that the contracting officer had "overpaid" C&G in varying amounts. In the court's view, this "admission," insofar as it goes, does not create a material question of fact on the discretion issue because there is no indication that the Air Force representatives ever admitted that the overpayments were erroneous, contrary to the terms of the contract or an abuse of discretion.

because the contractor was experiencing cash flow problems.[9] Plaintiff has not shown, in the least, that this action was an abuse of discretion and, therefore, this theory too is unavailing.

Plaintiff ultimately is left to argue, *sans* decisional support, that the Air Force breached some undefined fiduciary or equitable duty. These assertions also miss the mark. For one thing, such general breaches of claimed fiduciary or equitable duties are ordinarily viewed as giving rise, if anything, to torts,[10] the subject matter of which plainly is outside this court's jurisdiction. *See* 28 U.S.C. § 1491(a)(2) (2000) (no jurisdiction in cases "sounding in tort"); *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993) ("tort cases are outside the jurisdiction of the Court of Federal Claims"); *Gibbons v. United States*, 75 U.S. 269, 275 (1868) ("The language of the statutes which confer jurisdiction upon the Court of Claims, excludes by the strongest implication demands against the government founded on torts."). To the extent that breaches of the claimed duties could be viewed as violation of an implied-in-law contract, jurisdiction in this court is also lacking. *See Merritt v United States*, 267 U.S. 338, 341 (1925); *Cornejo-Ortega v. United States*, 61 Fed. Cl. at 376.

## III. CONCLUSION

This court need go no further. Based on the foregoing, the court **GRANTS** defendant's motion for summary judgment. The Clerk is directed to dismiss plaintiff's complaint.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge

[9] In this regard, a letter dated December 31, 1997, from Cashin Associates (which had been retained by plaintiff to assist G&C) to the Air Force indicates that "Cashin has been advised by representatives of G&C and the Government that the overpayment situation developed based on the need to maintain cash flow on this project." The same letter suggests that the progress payments may have corresponded to work actually performed by G&C, albeit relating to change orders, as opposed to the base contract, stating "G&C had commenced and in some cases completed work on a series of change orders, at the Government's request, prior to the issuance of a formal modification related to the extra work."

[10] *See Regents of Univ. of N. M. v. Knight*, 321 F.3d 1111, 1116 (Fed. Cir. 2003) (classifying breach of fiduciary duty as a tort); *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996) (same); *Newby v. United States*, 57 Fed. Cl. 283, 294 (2003) (same).